# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ELIZABETH LEODLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KRISPY KREME, INC., JOSH CHARLESWORTH, and JEREMIAH ASHUKIAN,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Elizabeth Leodler ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to her own acts, and upon facts obtained through an investigation conducted by her counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Krispy Kreme, Inc. ("Krispy Kreme" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Krispy Kreme's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Krispy Kreme securities between March 26, 2024 to May 7, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Krispy Kreme's financial growth and stability. Defendants' statements included, among other things, confidence in Krispy Kreme's expanded national partnership with McDonald's restaurants with phased rollouts beginning in the second half of 2024, and nationwide availability at participating restaurants expected by the end of 2026. Moreover, Defendants publicly reported impressive financial results, outlooks, and guidance to investors, all while using dishonest advertising practices.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts related to the demand for Krispy Kreme products at McDonald's locations. Specifically, Defendants failed to disclose that lower demand at McDonald's locations accounted for the declining average weekly sales per store; the partnership with McDonald's was not profitable thereby causing Krispy Kreme to pause expansion into new McDonald's locations. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Krispy Kreme securities at artificially inflated prices.

4.      The truth began to emerge on February 25, 2025, when Krispy Kreme issued a press release reporting disappointing fourth quarter 2024 financial results despite the recent partnership with McDonald's restaurants in March 2024. The Company reported a decline in "net revenue of

$404 million, a decline of 10.4%" in addition to a decrease in "DFD average sales per door per week…driven by changing customer mix."

5.      In response to this news, Krispy Kreme's stock price declined from $9.13 per share on February 24, 2025 to $7.13 per share on February 25, 2025. However, Defendants materially misrepresented and/or concealed the true risks they faced with respect the Company's projected demand for Krispy Kreme products at McDonald's restaurants after the initial marketing launch, while also downplaying the costs associated with expanding into new markets.

6.      Investors remained in the dark until the truth emerged on May 8, 2025, when Defendants issued a press release announcing the Company's first quarter 2025 financial results. In pertinent part, Defendants reported "[n]et revenue was $375.2 million in the first quarter of 2025, a decline of 15.3% or $67.5 million." Further, the Company announced it is "reassessing the deployment schedule together with McDonald's while it works to achieve a profitable business model for all parties" and given "the uncertainty around the McDonald's deployment schedule, the Company is withdrawing its prior full year outlook and not updating it at this time."

7.      Investors and analysts reacted immediately to Krispy Kreme's revelation. The price of Krispy Kreme's common stock declined from a closing market price of $4.33 per share on May 7, 2025 to $3.26 per share on May 8, 2025, a decline of about 25% in the span of just a single day.

8.      Investors have sustained significant damages as a result of Defendants' fraudulent statements. Plaintiff seeks to recover those damages by way of this lawsuit.

## JURISDICTION AND VENUE

9.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

10. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Krispy Kreme is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

14. Plaintiff Elizabeth Leodler purchased Krispy Kreme common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing her transaction(s) in Krispy Kreme is attached hereto.

15. Krispy Kreme, Inc. is an Delaware corporation with its principal executive offices located at 2116 Hawkins Street, Charlotte, North Carolina 28203. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "DNUT."

16. Defendant Josh Charlesworth ("Charlesworth") was, at all relevant times, the Chief Executive Officer, Director and President of Krispy Kreme.

4

17.     Defendant Jeremiah Ashukian ("Ashukian") was, at all relevant times, the Chief Financial Officer of Krispy Kreme.

18.     Defendants Charlesworth and Ashukian are sometimes referred to herein as the "Individual Defendants." Krispy Kreme together with the Individual Defendants are referred to herein as the "Defendants."

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Krispy Kreme' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20.     Krispy Kreme is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

21.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Krispy Kreme under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

22.    Krispy Kreme together with its subsidiaries, produces doughnuts in the United States and internationally. It operates in three segments: U.S., International, and Market Development. The company offers doughnut experiences through hot light theater and fresh shops, delivered fresh daily branded cabinets and merchandising units within grocery and convenience stores, quick service restaurants, club memberships, drug stores, and digital channels.

### The Defendants Materially Misled Investors Concerning Its Partnership with McDonald's Restaurants

#### *March 26, 2024*

23.    On March 26, 2024, Krispy Kreme issued a press release discussing its expanded nationwide partnership with McDonald's restaurants, with the phased rollout of the partnership to begin in the second half of 2024 with nationwide availability expected by the end of 2026. The release further stated, in pertinent part:

> This follows a successful test at 160 McDonald's restaurants in the Lexington and Louisville, Kentucky areas where consumer excitement and demand exceeded expectations. These pilot restaurants will continue to serve Krispy Kreme doughnuts during the nationwide rollout.
>
>                        \*\*\*
>
> Krispy Kreme has been scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its Delivered Fresh Daily expansion, which includes this phased rollout.

24.    Defendant Charlesworth highlighting, in pertinent part:

> The top request we receive from consumers, every day, is, 'please bring Krispy Kreme to my town.' Partnering with McDonald's on a national scale will provide our fans and doughnut lovers unprecedented daily access to fresh doughnuts and the joy that is Krispy Kreme.
>
>                        \*\*\*
>
> Significantly, by making Kreme Krispy accessible to fans nationwide through this partnership, we expect to more than double our points of access by the end of 2026.

The partnership accelerates the development of our existing Delivered Fresh Daily channel, creating operating leverage through distribution density and production utilization.

*May 9, 2024*

25. On May 9, 2024, Krispy Kreme issued a press release reporting its first quarter 2024 financial results and reaffirmed full year 2024 guidance. Defendant Charlesworth stated "[w]e're excited about our recently announced agreement with McDonald's, which is expected to add more than 12,000 new points of access in the U.S. by the end of 2026. We'll support much of this nationwide rollout using existing capacity, while adding distribution with other major customers as we grow."

26. On the same day earnings call, Defendants touted the recent agreement with McDonald's and the opportunity to drive growth through its partnership, with Defendant Charlesworth, stating, in relevant part:

Following our recent announcement to provide fresh doughnuts daily at McDonald's restaurants in the U.S., we have raised our long-term global points of access goal from 75,000 to 100,000 to include the quick service restaurant opportunity. ***Our pace of expansion is also accelerating. For the past 3 years, our global points of access grew by an average 19% per year to just over 14,000 by the end of 2023. Looking ahead, we expect fresh Krispy Kreme doughnuts to be available in 33,000 points of access already by the end of 2026. We expect this growth to be driven by a combination of both existing and new customers as well as new market expansion.*** For example, our nationwide rollout to McDonald's in the U.S. gives us the opportunity to add distribution at other major customers such as Walmart which still only lists us in about 25% of their stores and Target with whom we have already agreed to expand our presence.

\*\*\*

***Still, we do expect that the U.S. will be the biggest driver of our profitable expansion. The recently announced agreement with McDonald's is expected to bring Krispy Kreme to more than 12,000 of their U.S. restaurants by the end of 2026.*** We'll provide 3 of our most popular doughnuts, fresh every day, the iconic original grades, chocolate ice with sprinkles and chocolate ice cream filled. They will be available individually and in boxes of 6.

Case 3:25-cv-00469-MOC-DCK    Document 1    Filed 06/30/25    Page 7 of 34

McDonald's is making them available in restaurant by drive-thru and on their mobile app. This follows a successful test of more than 160 McDonald's restaurants in the Lexington and Louisville, Kentucky areas where consumer excitement and demand exceeded expectations. ***We are partnering with McDonald's on a phased rollout through to the end of 2026, which we expect to begin before the end of this year. We anticipate nearly tripling our U.S. point of access over the next 3 years from 7,775 today to more than 22,000 by the end of 2026.*** Much of the national rollout can happen using existing capacity, but we will also invest in our business to increase production hubs with spokes.

(Emphasis added).

27.     On the same earnings call, Defendant Ashukian discussed the costs involved in the

McDonald's national rollout, stating, in pertinent part:

While investing in our U.S. expansion, including start-up costs for the McDonald's national rollout, we expect to deliver positive operating leverage. Similarly, we anticipate incremental investments to open the new hubs as Josh referenced earlier and expect to trend towards the high end of the range on capital expenditures in 2024. We anticipate this to continue in 2025 and 2026 before trending towards 6% thereafter. As it relates to the second quarter of 2024, we expect to deliver net revenue growth of 6% to 8% and adjusted EBITDA growth of 8% to 10%. We will continue to closely monitor and adapt the changes in the market and uncertainty in the consumer environment and remain confident in our ability to drive operating leverage consistently throughout 2024.

28.     During a question-and-answer portion of the same earnings call, Defendants further

elaborated on the Company's partnership with McDonald's, stating, in pertinent part:

<Q: Sara Harkavy Senatore – Bank of America Securities – Analyst> So one is, if you could just clarify what impact, if any, you're including from that partnership either on top line? Or as I think about G&A, I think you've invested ahead of that partnership rolling out. how to think about that growth going forward or sort of the big upfront cost behind you? Or how long-- how many quarters perhaps should we expect to see sort of outsized G&A growth ahead of revenue growth. So just a sort of broader view on the McDonald's partnership implications for your P&L?

<A: Defendant Ashukian> ***We are collaborating with McDonald's to build a detailed rollout plan and anticipate the launch to start in the tail end of 2024. So from a revenue impact, we do expect that to be fairly minimal this year. What I would say with respect to cost, we are, as you mentioned, in the investment phase now and are incurring start-up costs and SG&A and OpEx.*** We're not disclosing exactly how much we're spending on that, but we are pleased that we can reaffirm our guidance, assuming those costs are in our business beginning in Q1.

<Q: John William Ivankoe – JP Morgan Chase – Analyst> First, as you begin to kind of have plans for overall relatively national penetration, are you beginning to have conversation with taking various major grocery and other types of national accounts on a national basis? In other words, as you begin to have the capacity to go into McDonald's, do you expect it to have a number of different simultaneous agreements with other national type both larger and smaller format retailers.

<A: Defendant Charlesworth> ***Yes, by distributing to almost every McDonald's in the country, this does indeed give us the opportunity to profitably add distribution with other major customers, both existing customers that we are underpenetrated in and indeed new ones. And I think the conversations that we've had with them since the announcement have largely been positive because they can see that we're able to build out our operating model on a national scale and therefore, serve them nationally.*** I mean, it's going to be really exciting to bring Krispy Kreme to Minneapolis, for example, the Home Target or to bring Krispy Kreme to Walmart in Arkansas. ***So these are things we haven't done up to now and we're really excited to do that. And so yes, the data that we shared today and our goal of getting to 15,000 points of access in the U.S. by 2026, obviously includes expansion beyond McDonald's as a result.***

<Q: William Bates Chappell – Truist Securities – Analyst> And then just to the McDonald's, I guess, 2 questions that I hear most often. One, trying to understand kind of the level of commitment on McDonald's and the franchisees down the road, I mean, you say you're going to, I think, 12,000 out of 13,000 doors. I mean is there-- and you're obviously spending a lot of money behind it. Is there any way McDonald's can say 1 year, 1.5 years into this, this isn't working or this doesn't work for certain franchises or and that changes that? Or is it full ahead, everybody is fully committed to going to that 12,000 through 2026.

<A: Defendant Charlesworth> McDonald's has been a great partner so far. We've really enjoyed the collaboration. ***The agreement last 1 year after the last rollout in 2026 and of course, can be renewed after that. So look, we've already announced our share from partnership with McDonald's. And it is about rolling out through to the end of 2026, and the intent is more than 12,000 restaurants, and that is the phased rollout plan that we're working on with McDonald's. We don't expect it to start until the tail end of the year, but it's really thoughtful.*** We'll obviously naturally prioritize places where we, at Krispy Kreme can provide availability faster. But the partnership is going really great so far after what was obviously a great Kentucky test and very thorough test that demonstrated that consumer demand outstripped both theirs and our expectations.

(Emphasis added).

29.     On August 8, 2024, Defendants conducted an earnings call corresponding to the Company's second quarter financial results during which Defendant Charlesworth promoted Krispy Kreme's national rollout in McDonald's restaurants and expansion into 85% of McDonald's U.S. footprint by 2026, stating, in relevant part:

> In the U.S., our accelerated national expansion provides an opportunity to profitably densify our network. ***We currently have more than 8,000 points of access in the U.S. We remain on track to add more than 12,000 McDonald's and about 3,000 with partners like Walmart and Target, bringing the goal to nearly 23,000 U.S. points of access by the end of 2026.***
>
> ***We are very pleased with our partnership with McDonald's. The national rollout begins this fall with the Midwest starting in Chicago. We expect to serve fresh doughnuts in more than 1,000 McDonald's restaurants by the end of the year, add 5,000 in 2025 and 6,000 in 2026, bringing us to more than 85% of their U.S. footprint.***
>
> Our team is hard at work modernizing the making and moving of doughnuts. We have a dedicated team, partnering with our customers, including McDonald's to ensure a smooth rollout. We are hiring and training experts in manufacturing operations, upgrading our doughnut production lines, continuously improving the manufacturing process and optimizing our delivery logistics network with improved routing and upgrades to our fleet. This expansion effort will increase utilization of our production hubs and distribution density.
>
> (Emphasis added).

30.     During the question-and-answer portion of the same earnings call, Defendants further detailed the Company's national roll out plan with McDonald's and investments in connection with as follows:

> <Q: Sara Harkavy Senatore – Bank of America – Analyst> I wanted to ask about - - you mentioned the McDonald's rollout and just basically thinking about -- are you still -- I guess twofold, are you still on track? I think the idea had been to kind of increase ratably the number of stores over time. Does that still sound like the right kind of rollout plan?
>
> And the second point is, I think you had -- you had seen some pretty significant investment ahead of that, whether it was in OpEx or G&A, are the biggest kind of

chunkiest increases behind us. And so going forward, the growth rate in operating expense should lag or at least more closely match revenues?

<A: Defendant Charlesworth: Yes, the McDonald's partnership is going very well in general. And the rollout is on track. We announced today that we will be first listing -- and with McDonald's beyond the Kentucky, pilot in the fall in Chicago and then expanding through the Midwest in the back end of this year and then obviously into next year. ***We expect to be in more than 1,000 McDonald's restaurants by the end of 2024. And then we have a rollout plan that we have partnered with McDonald's on through 2025 and indeed through 2026 with about 5,000 we're expecting to add generally evenly through the year of 2025.***

We have a dedicated cross-functional team there to make sure the facilities and our people are ready. In fact, we're also making improvements to the production lines and even doing our best to improve productivity and up our game as we go. We're very focused on delivering a really high quality service to the McDonald's restaurants so that people get awesome fresh doughnut every day at the same quality level they're expecting Krispy Kreme and other channels.

<A: Defendant Ashukian: ***To ensure a smooth the rollout, we are investing out of the opportunity with dedicated rollout teams to support our shops and training and development costs. We're also improving capabilities across our manufacturing and operations teams and upgrading the doughnut production lines.*** As you can imagine, the volume that we move through. All of this has been included in our guide, ongoing. ***We expect to manage costs prudently and deliver margin expansion as we ramp the McDonald's network serving nearly 85% of the brands U.S. footprint by 2026, as Josh mentioned.***

<Q: Rahul Krotthapalli – JP Morgan – Analyst> I think today, as I understand, there are around 4,000 to 5,000 doors untapped just between these 2 brands versus the 3,000-odd non-McDonald's doors you guys discussed for the guidance over the next 3 years. So, as you expand the hub and spoke infrastructure, is it fair to expect there will be almost no additions or very low -- or a lower mix of convenience stores or low-volume door additions as we go along expanding this side of the business? And also, will profitability follow this?

<A: Defendant Charlesworth: …***it's important to understand that the McDonald's nationwide expansion is a bit of a catalyst for us. It enables us to really expand our DFD business faster than we would have been able to otherwise. And so we're focused on naturally the high-quality national players***…C-stores and other smaller locations, smaller lower traffic locations, are actually still very helpful to us, though, because you think all the places you go on the way to a McDonald's, Target, Walmart, Kroger, you're going to be going past convenience stores, gas stations, making the logistics route efficient. ***And so we still see a role for those to play. But naturally, we're focused on those big national partners that the McDonald's program unlocks for us.***

(Emphasis added).

<u>November 7, 2024</u>

31.    On November 7, 2024, Defendants held an earnings call corresponding to the Company's third quarter financial results where Defendant Charlesworth touted the positive consumer response to the nationwide rollout in McDonald's restaurants, stating, in pertinent part:

> The nationwide rollout to McDonald's has started well, with fresh doughnuts delivered daily to more than 400 McDonald's in Chicago since mid-October from our 3 production hubs in the city, I want to thank our dedicated Krispy Kremers and McDonald's teams who have partnered closely to ensure a smooth rollout so far. The consumer response has been positive, and the pace of growth accelerates from here with more than 1,000 additional restaurants launching this month alone in Ohio, Indiana, Pennsylvania and West Virginia. We're off to a strong start on our journey to meet our goal of making fresh Krispy Kreme Doughnuts available in more than 12,000 McDonald's by the end of 2026. McDonald's is supporting the launch with a comprehensive local marketing plan, including TV, social media and out-of-home billboards. We expect this increased visibility to benefit Krispy Kreme brand awareness as we expand to more cities across the country.

32.    On the same earnings call, Defendant Ashukian elaborated on the Company's full year guidance noting the accelerated expansion into McDonald's restaurants, stating, in relevant part:

> **We are adjusting our full year guide to reflect the third quarter results, the acceleration of our expansion with McDonald's** and the completion of the Insomnia Cookies transaction in July 2024. We continue to expect full year revenue between $1.65 billion and $1.685 billion with organic revenue growth of 5% to 7%. We are updating our adjusted EBITDA expectations to be between $205 million and $210 million this year. We now expect between $0.18 and $0.22 of adjusted earnings per share for the full year.
>
> As Josh mentioned, we're now restructuring our management teams to focus on our business priorities to build a bigger and better Krispy Kreme. I believe this will make us more effective and efficient and estimate $8 million to $12 million of annualized net SG&A cost savings beginning in 2025. **I remain confident in the potential for value creation as we continue to evolve our business to support our numerous global growth opportunities.**

(Emphasis added).

12

33.     During the question-and-answer portion of the same earnings call, Defendant

Charlesworth reiterated the positive consumer response to its partnership with McDonald's, stating

in part:

> <Q: Brian James Harbour – Morgan Stanley – Analyst> With McDonald's, as you
> start going into some of the other new markets, I mean, is what you've seen on a
> kind of a revenue per door basis been consistent?
>
> <A: Defendant Charlesworth> Yes. Well, McDonald's customers, they're clearly
> excited to see our fresh doughnuts on the menu. It's more convenient for a Krispy
> Kreme fan to pick-up and enjoy our fresh doughnuts any time of the day. So what
> we're seeing so far is a really good response in line with our original assumptions.
> We're seeing incrementality in Chicago, no obvious impact on our existing
> doughnut shops there and plenty of positive feedback from the McDonald's teams.
> And regarding the reception of the brand in Chicago, I think that the strong support
> McDonald's is putting behind this is no doubt part of that. ***And indeed, you heard
> us reference earlier today, the confidence that we have from the success is having
> us sort of accelerate to service more restaurants as fast as we can, all align with
> our strategy of becoming bigger and better. So we're really pleased with the start,
> both from a consumer response point of view and the reception we've got from
> the McDonald's team about our service and quality doughnuts.***
>
> <Q: Rahul Krotthapalli – JP Morgan – Analyst> Is there any way you guys are
> able to see the attach rates for the current stores that are offering the product with
> the McDonald's transactions if they share that data with you guys? I'm just trying
> to get a sense of how it can translate into a good retail demand and if there is any
> upside to the numbers we discussed in the past on the weekly sales?
>
> <A: Defendant Charlesworth: What we can see is good response from the consumer.
> ***Obviously, we're making -- we can track the deliveries. We can track any that are
> unsold. And indeed, we can see that they clearly sold throughout the day. We're
> very pleased that the McDonald's team making sure that we're not out of stock
> and our product is well presented and always the freshest and highest quality.
> Everything we see gives us confidence that this resonates with the consumer. And
> the feedback from McDonald's definitely shows that.*** But indeed, they don't
> necessarily share all that consumer data, at least not yet. So from our point of view,
> it meets the need of our Krispy Kreme customer. The response has been fantastic
> online and directly back to us from Krispy Kreme fans. So we're feeling confident
> around the projections that we shared in the past.
>
> (Emphasis added).

34.     Defendant Ashukian also discussed the costs associated with ensuring a "smooth rollout" during the question-and-answer segment, pertinently stating:

> <Q: Sara Harkavy Senatore – Bank of America – Analyst> Just wanted to ask about the guidance and the outlook. I know you mentioned sort of unexpected, I think that was $3 million. But as I think about the guide for sort of in line or maintaining the top line, but lowering EBITDA, I guess, what are the specific changes? I know you had already anticipated investing pretty heavily into the rollout of McDonald's. So was that greater than even you had thought? Is it pulled forward versus the timing shift versus an absolute dollar amount? And then as you think about like revenue, any sort of changes there?

> <A: Defendant Ashukian> And maybe I'll start with the revenue kind of point and work back. ***But our guide of 5% to 7% organic revenue for the year, reflects our confidence in our ability to continue to grow revenue amidst choppiness in traditional retail locations, which in the guide is being offset. So we're seeing some softness in retail by the small contribution of incremental top line due to the accelerated expansion. So we feel good that we can hold the top line.*** The full year guide on EBITDA was updated to reflect the impact of higher logistics costs in the quarter, our intentional decision to accelerate start-up costs… ***As mentioned on the call, I think it's important to note that we are committed to continuing to drive a better business. We believe we'll return to operating leverage in the fourth quarter.***

> <Q: William Bates Chappell – Truist Securities – Analyst> Just talking more about the McDonald's kind of costs and the pull forward. I mean, how do we look at 2025 with the thought of you are going to be doing thousands and thousands of doors and maybe you're going to be pulling that forward. I mean, does that mean there's some pretty big upfront costs in the first half of next year where it really impacts profitability or even for the full year? Or is this just a few million dollars here or there this quarter just on a timing issue? Just trying to understand, especially as we move forward and imagine you want to roll-out McDonald's as fast as possible, how that affects the P&L.

> <A: Defendant Ashukian> ***As I mentioned previously, no surprise on the cost front to ensure a smooth rollout. We intentionally are investing ahead of the opportunity with things like increased training and development, ensuring our teams are prepared for doughnut shop, rollout district manager level, dedicated rollout teams and overstaffing drivers to ensure availability early and ensure that we're driving service.*** We're also improving capabilities in manufacturing operations and upgrading doughnut production lines and our delivery logistics network.

<Q: David Palmer – Investor> Just given the U.S. margin shortfall in the third quarter here, what are you doing to ensure that EBITDA margin can grow in 2025 as you ramp with McDonald's?

<A: Defendant Ashukian> What I can tell you is we're meeting daily as we execute the rollout of McDonald's and start to expand in different cities, just to take the learnings, as Josh kind of mentioned, and applying course correct as we go. ***So we feel pretty good that we're making the right choices, trade-offs. We have an ecosystem in place where we're managing issues real time and making choices where we need to be to make sure that we're seeing the flow-through that we need to. As a reminder, we are investing ahead of the curve right now in the U.S. and things like incremental equipment and facilities, repairs and maintenance, I mentioned training and development, dedicated market roll-out teams.*** And we do expect that EBITDA margins will start to improve in the U.S. more in the back half of the year, just given some of those start-up costs.

(Emphasis added).

35.    The above statements in Paragraphs 23 to 34 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected demand for Krispy Kreme products at McDonald's restaurants after the initial marketing launch while also downplaying the costs associated with expanding into new markets. In truth, the declining demand of Krispy Kreme products at McDonald's locations accounted for the declining average weekly sales per store eventually leading to the end of its partnership and despite declines in revenue the Company continued to invest in expansion. Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

### *The Truth Begins to Emerge*

#### *February 25, 2025*

36.    On February 25, 2025, Krispy Kreme issued a press release announcing its fourth quarter 2024 financial results, with Defendant Charlesworth stating, in relevant part:

We delivered an 18th consecutive quarter of year-over-year organic sales growth. Excluding the estimated cybersecurity incident impact, results were largely in line

with our expectations…Last quarter, we announced we were aligning our talent and capital to our business priorities, and we have taken significant action. We have restructured our management teams to maximize profitable U.S. expansion and capital-light international growth. We expect to soon award contracts to outsource U.S. logistics. Finally, we have begun a process to evaluate refranchising certain international markets. I believe these changes will drive capital efficient growth, as we continue our transformation into a bigger and better Krispy Kreme.

37.     The press release further reported, in pertinent part:

## Fourth Quarter 2024 Consolidated Results *(vs Q4 2023)*

Krispy Kreme's fourth quarter results reflect the strength of the omni-channel model, ***delivering net revenue of $404.0 million, a decline of 10.4%, compared to $450.9 million in the same quarter last year*** primarily due to the sale of a majority ownership stake of Insomnia Cookies in the third quarter of 2024 ($101 million impact) and the 2024 Cybersecurity Incident (estimated $11 million impact). Organic revenue grew 1.8%, driven by the Company's first quarter of Delivered Fresh Daily ("DFD") sales in excess of $100 million worldwide. Organic revenue was impacted adversely by an estimated 280 basis points from lost revenue linked to the 2024 Cybersecurity Incident.

GAAP net loss was $22.2 million, compared to income in the prior year of $1.9 million. GAAP Diluted Loss per Share was $(0.13), a decline of $(0.15) from the same quarter last year.

***Global Points of Access grew 24.1%, linked to the Company's accelerating U.S. expansion now reaching more than 1,900 McDonald's restaurants with daily deliveries of Krispy Kreme doughnuts, alongside growth internationally.***

Adjusted EBITDA in the quarter declined 28.4% to $45.9 million, linked to an estimated $10 million dollar impact from the 2024 Cybersecurity Incident, with Adjusted EBITDA margins contracting 280 basis points to 11.4%. Adjusted EBITDA Margin reflects an estimated 210 basis point negative impact from the 2024 Cybersecurity Incident.

Adjusted Net Income, diluted declined to $1.2 million in the quarter from $15.1 million in the same quarter last year. Adjusted EPS declined $0.08 to $0.01 from $0.09 in the same quarter last year, due to increased interest expense and depreciation and amortization and an estimated impact of $0.04 due to the 2024 Cybersecurity Incident.

***

## Fourth Quarter 2024 Segment Results ( *vs Q4 2023)*

**U.S.:** In the U.S. segment, net revenue declined $50.9 million, or 17.2%, largely attributable to the sale of Insomnia Cookies ($57.4 million impact), a decline in

retail sales, and the 2024 Cybersecurity Incident; partially offset by growth in the DFD business. Organic revenue declined by 1.2%, with an estimated headwind of 460 basis points attributable to the 2024 Cybersecurity Incident. Sales per Hub in the U.S. remained consistent at $4.9 million and DFD average sales per door per week decreased, as expected, and were $631, driven by changing customer mix.

U.S. Adjusted EBITDA decreased 44.0% to $23.6 million with Adjusted EBITDA margin contraction of 460 basis points to 9.6%, of which an estimated 350 basis points were attributable the 2024 Cybersecurity Incident.

*** 

**2025 Financial Outlook**

Krispy Kreme issues the following guidance for the full year 2025 *(vs FY2024)*

- Net Revenue of $1,550 to $1,650 million
- Organic Revenue growth[1] of +5% to +7%
- Adjusted EBITDA[1] of $180 to $200 million
- Adjusted EPS[1] of $0.04 to $0.08
- Income Tax rate between 32% and 36%
- Capital Expenditures of 6% to 7% of net revenue
- Interest Expense, net of $65 million to $75 million

The company expects leverage to trend towards 4.0x by year end 2025.

(Emphasis added).

38.     During the corresponding same day earnings call, Defendant Charlesworth highlighted Krispy Kreme's partnership with national stores and restaurants, specifically noting McDonald's restaurants, stating in relevant part:

We continued to expand availability in 2024, as we grew global points of access by 24%. In the U.S., we added more than 2,800 new doors with national partners such as McDonald's, Kroger, Publix and Target, who are eager to expand with us nationally. Internationally, company-owned points of access also increased 14%, driven by Australia and Canada. ***This very morning, we launched daily deliveries to approximately 500 McDonald's restaurants in the Greater New York City area and remain on track to reach about 6,000 restaurants by year-end.***

In 2025, we expect to continue our U.S. expansion with national partners, both existing and new; for example, Costco. An added benefit of this expansion with national partners is the opportunity to identify and close existing underperforming doors, which we expect to do in 2025.

While much of this growth is enabled by existing capacity, growing into new and underserved geographies will be supported by adding hubs with spokes, of which we now have 158. We expect to build 5 to 7 of these in 2025 in areas like Minneapolis, keeping our expansion on track. Through this growth, we will increase doughnut volumes at existing production hubs, which is expected to improve productivity and profitability.

(Emphasis added).

39.     During the question-and-answer portion of the call, Defendants elaborated on its business with McDonald's and expected growth in fiscal 2025:

<Q: Andrew Paul Wolf – CL King & Associates, Inc. - Analyst> I wanted to ask you about your business with McDonald's, just how '24 came out versus internal expectations, top and bottom line, and what is kind of reflected, however specifically you can speak to it, in 2025, with any updates based on results.

<A: Defendant Charlesworth> Andrew, we started the phased rollout of McDonald's just in October. We're already in actually 2,500 restaurants today. We're launching in New York just today. We expect to be in about 6,000 by the end of the year and 12,000 by the end of 2026. So that rollout is on track.

It's important to understand as well that the phased nationwide rollout of McDonald's is part of a broader strategy to make our fresh doughnuts more accessible, as mentioned earlier, with Walmart, Target, Kroger, Costco and others. *So all that being said, the feedback from McDonald's is very positive; they tell us it's working well. And we're working hard with them to maximize the opportunity, make sure that the launch goes well. And we've seen during the launch phase that with local marketing, the team at McDonald's is able to raise awareness, make sure that people know it's on the menu, driving very strong demand and no visible cannibalization of our other sales channels.*

*Now what we're doing now, it's early on in the rollout, we're making sure that we're working with them to maximize the opportunity during the whole rollout phase, even when that local marketing comes off, when that awareness drops, when it's not as visible on the menu, when naturally demand softens.* We're making sure that we work with them to get all the way to the national rollout phase at the end of 2026, when we'd expect they would start putting on national marketing.

<Q: Andrew Paul Wolf – CL King & Associates, Inc. - Analyst> So that's sort of like the J-curve, where initial demand is above sort of the steady state, which I think is typical, right? And has that been in line with expectations?

<A: Defendant Charlesworth> As I said, the feedback from them is very positive. *And so the partnership continues to progress very well. And it continues to unlock*

*for us expansion opportunities across the country.* I mentioned Costco. It's a really big opportunity for us. It wouldn't have been possible without starting with the McDonald's rollout. Target, which we just started in 2024, following the announcement of McDonald's, continues to be a big expansion driver in 2025. So it's part of an overall program to get our awesome fresh doughnuts out to more people.

<Q: Brian Hugh Mullan - Piper Sandler – Analyst> In the prepared remarks, I believe you said you could have half the U.S. system by year-end. Just related to that, can you just give an example of the puts and takes from a P&L perspective: what expenses would go away, what new expenses would you have? And can you talk about whether or not there would be a net benefit to EBITDA as you see it once it's all in place?

<A: Defendant Ashukian> And we've begun to scale, obviously, to support DFD expansion in the U.S., including McDonald's, with our existing in-house model to start. In February, we moved to the contract phase and remain engaged with multiple carriers to finalize contracts.

***While we go through this phase and into the rollout, we do expect some transition costs in moving to an outsourced model. So a bit of kind of EBITDA pressure. But we are targeting EBIT-neutral. However, we're still in the negotiation phase, but expected costs are contemplated in our guide.***

(Emphasis added).

40.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the March 26, 2024 press release, May 9, 2024, August 8, 2024 and November 7, 2024 earnings calls. On those calls, Defendants touted the Company's partnership with McDonald's and claimed that the arrangement would be a key growth driver and provide a pathway to U.S. and global expansion.

41.     Investors and analysts reacted immediately to Krispy Kreme's revelation. The price of Krispy Kreme's common stock declined dramatically. From a closing market price of $9.13 per share on February 24, 2025, to $7.13 per share on February 25, 2025.

42.     Notwithstanding Defendants' disclosures during the calls, they continued to mislead investors by misrepresenting the expectations of its Daily Fresh Delivery (DFD) revenue

contribution from the new partnership with McDonald's and continuing investment costs. In doing so, Defendants deceptively claimed confidence in their planned efforts to expand their customer base within the U.S and globally.

*February 27, 2025*

43.     On February 27, 2025, Krispy Kreme filed its annual report on Form 10-K with the SEC which stated, in relevant part:

> In addition to grocery and convenience stores, we are also expanding in DFD channels such as QSR and club membership to further broaden availability of our doughnuts to consumers. This includes our QSR partnership with McDonald's. Following a successful pilot at approximately 160 McDonald's restaurants in Louisville and Lexington, Kentucky and the surrounding area, we entered into an agreement to work with McDonald's to develop a deployment schedule for a U.S. national rollout of the sale of Krispy Kreme doughnuts at McDonald's restaurants. ***The deployment schedule sets forth the anticipated launch period for each McDonald's business unit in the U.S., with phasing expected through the end of fiscal 2026. In the fourth quarter of fiscal 2024, the rollout continued at McDonald's restaurants in places such as Illinois, Indiana, Michigan, Ohio, and Pennsylvania, with total DFD Doors with McDonald's surpassing 1,900 by year-end.***
>
> ***
>
> ***We added net 3,508 new DFD Doors during the fiscal year as we continue to focus on the deployment of our Hub and Spoke model and our expansion into QSR channels. We plan to continue adding new locations and expanding our digital platform in order to extend the availability of and access to our products.*** We are excited about our partnership with McDonald's and the phasing of the U.S. national rollout, which we believe has validated the attractiveness of the QSR channel.

(Emphasis added).

*April 23, 2025*

44.     On April 23, 2025, Krispy Kreme issued a press release announcing its Board of Directors had nominated a "refreshed slate of directors" in order to "provide valuable partnership for the management team as it continues to execute the Company's transformation into a better and bigger Krispy Kreme." The release highlighted, in relevant part:

The director nominees include Bernardo Hees, Patrick Grismer, Easwaran Sundaram, and Gordon von Bretten.

***

Bernardo Hees is a seasoned executive with a track record of leading global, consumer-facing businesses through transformative growth. He previously served as CEO of Kraft Heinz Company, Burger King Worldwide and H.J. Heinz Corporation, and Executive Chairman at Avis Budget Group. Reinforcing his confidence in Krispy Kreme's strategy and profitable growth opportunities, he has personally invested in the Company's common stock.

Defendant Charlesworth stating, in pertinent, part:

Welcoming Bernardo to our Board at a pivotal time for Krispy Kreme will be invaluable as we seek to maximize shareholder value through our two largest growth opportunities: profitable U.S. expansion and capital-light international growth. Establishing a Strategy and Operating Committee that leverages Bernardo's experience will support me and my team as we strive to drive operational and financial success.

45.     The above statements in Paragraphs 36 to 44 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected demand for Krispy Kreme products at McDonald's restaurants after the initial marketing launch while also downplaying the costs associated with expanding into new markets. In truth, the declining demand of Krispy Kreme products at McDonald's locations accounted for the declining average weekly sales per store eventually leading to the end of its partnership and despite declines in revenue the Company continued to invest in expansion.

**The Truth Emerges**

*May 28, 2025*

46.     On May 28, 2025, Defendants issued a press release reporting mixed first quarter 2025 financial results reporting "[n]et revenue was $375.2 million in the first quarter of 2025, a

decline of 15.3% or $67.5 million." Further, with regard to its partnership with McDonald's the release stated, in pertinent part:

> The Company is reassessing the deployment schedule together with McDonald's while it works to achieve a profitable business model for all parties and does not expect to launch in any additional restaurants in the second quarter of 2025.
>
> Krispy Kreme continues to believe in the long-term opportunity of profitable growth through the U.S. nationwide expansion including McDonald's.
>
> Given macroeconomic softness and the uncertainty around the McDonald's deployment schedule, the Company is withdrawing its prior full year outlook and not updating it at this time.

47.    During the same day earnings call, Defendant Charlesworth made it clear that intervention was required to support and sustain profitable growth with regard to its partnership with McDonald's. He continued, in pertinent part:

> Turning to McDonald's. 6 months after the national rollout began, we're now in more than 2,400 restaurants. Our 2 companies have partnered closely together during this time to support execution, marketing and training, delivering a great consumer experience and we are pleased with many aspects of the program.
>
> ***However, we are seeing that after the initial marketing launch, demand dropped below our expectations, requiring intervention. To deliver sustainable profitable growth, we are partnering with McDonald's to increase sales by stimulating higher demand and cutting costs by simplifying operations.***
>
> At the same time, we are reassessing our deployment schedule together with McDonald's, while we work to achieve a profitable business model for all parties. Given this, we do not expect to launch any additional restaurants in Q2.
>
> ***That said, we continue to believe in the long-term opportunity of profitable growth through our U.S. nationwide expansion, including McDonald's. I'd now like to share that we are increasing hub-and-spoke efficiency by better managing costs to drive profitable growth.***
>
> (Emphasis added).

48.    Defendant Ashukian detailed the Company's financial outlook and decline in revenue, stating, in relevant part:

Turning to the U.S. segment. Growth in points of access and DFD revenue was more than offset by the aforementioned consumer softness and planned reduction of discount days, resulting in organic revenue decline of 2.6%.

Adjusted EBITDA declined to $15.9 million due to softness in our retail segment, the sale of Insomnia Cookies, costs associated with our U.S. nationwide expansion and an estimated $5 million of operational inefficiencies related to the 2024 cybersecurity incident. Average revenue per door per week, or APD, was $587, down from the same period 1 year ago, reflecting the shift in customer mix as we introduced McDonald's.

***As Josh mentioned, pursuing quality growth means scaling with strategic national partners and also focusing on our core offerings. Given the scope of these actions amid macroeconomic softness and uncertainty around McDonald's, we are withdrawing our prior full year outlook and not updating it at this time.***

(Emphasis added).

49. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 25, 2025 earnings call, in the February 27, 2025 SEC filing and April 23, 2025 press release. On those calls, Defendants touted the Company's partnership with McDonald's and claimed that the arrangement would be a key growth driver and provide a pathway to U.S. and global expansion. In truth, the declining demand of Krispy Kreme products at McDonald's locations accounted for the declining average weekly sales per store eventually leading to the end of its partnership and despite declines in revenue the Company continued to invest in expansion

50. A number of well-known analysts who had been following Krispy Kreme reported on the Company's suspended guidance in response to the Company's disclosures. For example, JP Morgan released a statement regarding Krispy Kreme's recent issues, stating, in pertinent part:

Execution was not perfect by any means but a more aggressive focus (and transparency) on DFD churn is expected, which continues to remain a focus area for us.

This quarter taught the painful reality of not only the underestimated execution risk but also the uneven store/store demand of the MCD rollout plan. Krispy Kreme was

intended to be in nearly all MCD in a given market to realize scale around marketing and distribution.

51.     Similarly, Truist Securities released a statement on Krispy Kreme's shockingly speedy downfall as to its McDonald's partnership, as well as the Company's future strategy, stating, in relevant part:

> We are shocked by the speed at which the story fell apart. Management provided a "everything going as planned message" on the 4Q earnings call in early February and at several conferences YTD, and this is one area not particularly impacted by tariffs or new items from the administration. We no longer have high conviction in management's previously stated strategy and execution of these initiatives, and it will likely take several quarters before we or investors can regain confidence.

52.     As a result, investors and analysts reacted immediately to Krispy Kreme's revelation. The price of Krispy Kreme's common stock declined from a closing market price of $4.33 per share on May 7, 2025 to $3.26 per share on May 8, 2025, a decline of about 25% in the span of just a single day.

### Loss Causation and Economic Loss

53.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Krispy Kreme's common stock and operated as a fraud or deceit on Class Period purchasers of Krispy Kreme's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Krispy Kreme's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Krispy Kreme's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

54.     Krispy Kreme's stock price fell in response to the corrective event on May 8, 2025, as alleged *supra*. On May 8, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Krispy Kreme's forecasting processes and 2025 full-year financial guidance.

**Presumption of Reliance; Fraud-On-The-Market**

55.     At all relevant times, the market for Krispy Kreme's common stock was an efficient market for the following reasons, among others:

(a)     Krispy Kreme's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Krispy Kreme communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Krispy Kreme was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Krispy Kreme was reflected in and incorporated into the Company's stock price during the Class Period.

56.     As a result of the foregoing, the market for Krispy Kreme's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Krispy Kreme's stock price. Under these circumstances, all purchasers of Krispy Kreme's common stock during the Class Period suffered similar injury

through their purchase of Krispy Kreme's common stock at artificially inflated prices, and a presumption of reliance applies.

57. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

58. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with materially misleading statements with revenue projections while at the same time failing to maintain proper forecasting processes as to consumer demand and expansion costs.

59. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

60. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Krispy Kreme who knew that the "forward-

looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Krispy Kreme's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

62.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Krispy Kreme's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Krispy Kreme or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 2, 2025, there were 170.8 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by

thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

63.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Krispy Kreme;

(c)    whether the Individual Defendants caused Krispy Kreme to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Krispy Kreme's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)	whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66.	A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder*

67.	Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.	This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

69.	During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Krispy Kreme common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire

Krispy Kreme's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

70. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Krispy Kreme securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

71. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

72. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Krispy Kreme's internal affairs.

73. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Krispy Kreme's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Krispy Kreme's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Krispy Kreme's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

74. During the Class Period, Krispy Kreme's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Krispy Kreme's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Krispy Kreme's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Krispy

Kreme's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

77. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Krispy Kreme's misstatements.

79. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Krispy Kreme which had become materially false or misleading.

80. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Krispy Kreme disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Krispy Kreme to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Krispy Kreme's common stock.

81.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Krispy Kreme to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

82.     By reason of the above conduct, the Individual Defendants and/or Krispy Kreme are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: June 30, 2025                                    Respectfully submitted,


/s/ S. Ranchor Harris __              
S. Ranchor Harris
**RANCHOR HARRIS LAW**
1784 Heritage Center Drive, Suite 204-E
Wake Forest, NC 27587
919-249-5006 (direct line)
ranchor@ranchorharris.com
ranchorharris.com
919-589-4845 (facsimile)

-and-

Adam M. Apton (*pro hac vice* forthcoming)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff Elizabeth Leodler*